BOLTON *v.* CITY OF GREENVILLE

No. 43433 October 4, 1965 178 So. 2d 667

*R. Jess Brown,* Jackson; *Jack Greenberg, Melvyn Zarr,* New York, N. Y., for appellant.

*J. Robertshaw, Bogen, Wilkes & McGough,* Greenville, for appellee.

BRADY, TOM P., J.

This cause is an appeal from an order of the Circuit Court of Washington County affirming a judgment and sentence of the Washington County Court imposed on September 19, 1963, which required the appellant to pay a fine of $100 and costs, and to serve ninety days in the city jail. By agreement of counsel the above styled cause and Cause No. 43,435 were consolidated for argument in the circuit court. It is conceded by counsel representing the City of Greenville and the appellants that the causes arose out of substantially the same set of facts. When the cases were argued in this Court, the arguments were again consolidated by agreement of counsel and the Supreme Court was authorized to take the agreed facts as presented in the consolidated argument and apply them in both cases.

As briefly as possible, the facts of which this case arose are as follows: At high noon on June 29, 1963, the appellant, a Negro girl eighteen years of age, went to Strange Park, which is a public park in the city of Greenville. She was accompanied by Amye Lee Bynum, another eighteen year old Negro girl, and four Negro boys aged seventeen or less. They carried with them only a glove and a baseball. Shortly after they began throwing and catching the ball in the park, numerous calls began to be made to the police station. These calls were received by Desk Sergeant W. G. Horton, who was advised that a large crowd of people were congregating at Strange Park. Sergeant Horton detailed Officer Billy H. Hicks to go to Strange Park to investigate why the crowd was congregating there. He then telephoned W. C. Burnley, Chief of Police of Greenville, and advised him of the telephone calls. It appears that Chief Burnley contacted Captain Harvey Tackett and the two went to Strange Park. When Officer Billy H. Hicks arrived at the park he found about a hundred people had gathered there and that they had parked their cars along the side of the three roads which parallel three sides of the park.

Some had parked their cars in the road, remaining therein, while others had gotten out and were standing and watching the six Negro teenagers throwing the baseball back and forth.

Upon arriving, Patrolman Hicks and another patrolman, named Fryer, began to do what they could to disperse the crowd of white people, telling them to move on. Apparently all white persons to whom the order was given obeyed it. Captain Tackett arrived, and also Chief of Police W. C. Burnley. Shortly thereafter a small group of possibly eight or ten teenage white boys came from across the street into the park, going toward the group of Negroes who were throwing the ball. Captain Tackett and the other policeman met them before they got to the group of Negroes and ordered them to move on. When so ordered, the eight or ten white boys moved on. Captain Tackett stated it was from this group of white boys that the remarks were being made to the officers to the effect that the policemen should move the Negroes out of the park or that they would do so, saying, "let us handle it, we'll move them off," or similar statements.

Both Captain Tackett and Chief Brunley stated that the crowd in the park was increasing in numbers and that it had risen, while they were present, from a hundred to a hundred and fifty or two hundred persons, and that there were only four or five police officers there on duty. They testified further that they were afraid that the crowd might get out of hand; that a violent breach of the peace was imminent and that in their opinion they would not be able to control the crowd. Captain Tackett testified that he twice asked the appellant to "move on," and she refused to do so. The record discloses that the Chief of Police did not arrest any of the white persons for the reason that he feared that the arrest of a white person would probably precipitate violence to the Negroes. Captain Tackett testified that

after he had asked her to move the second time, she stood there and didn't say anything; that he ordered the Bynum girl to move on a third time and she did not say anything at first, and then he asked her if she was going to move on, whereupon she pointed to a teenage boy who was there, saying that he would have to ask the boy, who was one of her companions.

Realizing that the white crowd surrounding the park was increasing in size, Chief Burnley instructed the captain to order the appellant again to move on, which was done, and when she failed to comply, Chief Burnley ordered the captain to arrest the appellant and the other five Negroes. They were arrested, placed in patrol cars, and carried to the city jail.

Chief Burnley and the policemen testified the appellant and others were arrested only after they refused to obey their orders; that they were there protecting the safety of the Negroes and everyone else and arrested the Negroes only after the peril to their safety became imminent because of the danger of not being able to control the crowd. Chief Burnley stated that appellant was arrested for a breach of the peace because she had refused to move on when ordered to do so, but remained there, and "it was beginning to cause an incident" which would have led to a breach of the peace and violence.

Patrolman Hicks testified emphatically that the appellant did not violate any law in his presence for which she should have been arrested prior to the time the order to "move on" was given.

Captain Tackett testified that he did not observe the appellant doing anything herself other than "playing" ball. He testified that the appellant did not make any threats or commit any acts which would indicate that she or her group was likely to commit any violence upon the other people.

Chief Burnley testified that he "arrested the appellant because her presence there on that occasion had

caused this crowd to gather and it was an imminent breach. of the peace.'' Chief Burnley further stated that the appellant and her group were not doing anything there other than playing ball and that the appellant and the other Negroes had a right to be there until she caused some breach of the peace or committed some violation of the law. Chief Burnley further stated that it was fairly certain what would have happened had they not gotten the Negroes out of the park; that is, violence would have occurred and someone would have, been injured.

The record discloses that Strange Park is an integrated municipal park, and each of the police officers testified that they had seen Negroes using the park and playing therein, and that this had occurred on many occasions. In response to the question, ''You have been by there a number of times; have you ever seen any Negroes in that park?'' Captain Tackett replied, ''I have many times.''

 █ The appellant assigned four errors. The determination of this case requires the consideration of only one of these errors, namely, error number two, which is: ''The court below erred in affirming a judgment of conviction based upon no evidence of guilt.'' It is unnecessary for this Court to pass upon the other errors assigned. The question before this Court therefore is simply whether or not the evidence as disclosed in the record is sufficient to sustain a judgment of conviction. After a careful and objective study of the evidence, we are led to the inescapable conclusion that the proof is wholly insufficient to support and sustain the verdict of guilty and the sentence imposed upon the appellant.

The record fails to show that the appellant or her companions had uttered any loud, threatening, provocative, vulgar, indecent, or profane language. In fact, the record fails to show that appellant said anything to anyone except to ask that the ball be thrown to her. The

.record fails to show that she was guilty of any boisterous conduct, or did anything to antagonize anyone, except to remain in the park after being told to move on. Police Chief Burnley stated she had a right to be in the park until she caused some breach of the peace, or committed some violation of the law.

The conduct of the appellant is quite similar to the conduct of the appellant in Thomas v. State, 380 U. S. 524, 14 L. Ed. 2d 265 (1965), except that the City of Jackson had a far stronger case against Thomas than is presented here. The United States Supreme Court, by a per curiam opinion, refused to permit the city of Jackson to arrest and punish Thomas for the execution of a premeditated and resolute plot to violate substantially the same statute of the State of Mississippi, which action precipitated one of the most explosive and dangerous potentials for a breach of the peace yet fomented in this state. The case at bar is not distinguishable, on the facts or the law applicable, from the Thomas case, which is controlling here.

Almost the same identical question has been up for review upon appeal to the United States Supreme Court in Wright v. Georgia, 373 U. S. 284, 83 Sup. Ct. 1240, 10 L. Ed. 2d 349 (1963). In that case six Negroes entered and played basketball in a public park in Savannah, Georgia, which, unlike the case at bar, had customarily been reserved for whites. The Negroes were arrested for a breach of the peace. The state of Georgia, attempting to defend the convictions on appeal to the Supreme Court of the United States, asserted, as the City of Greenville now does in the case at bar, that hostile onlookers might have created an incident. The United States Supreme Court rejected this contention stating:

(T)he possibility of disorder by others cannot justify exclusion of persons from a place if they otherwise have a constitutional right (founded upon the Equal Protection Clause) to be present. Taylor v. Louisiana,

370 U.S. 154, 8 L. Ed. 2d 395, 82 S. Ct. 1188; Garner v. Louisiana, 368 U. S. 157, 174, 7 L. Ed. 2d 207, 219, 82 S Ct 248; see also Buchanan v. Warley, 245 US 60, 80, 81, 62 L. Ed. 149, 163, 38 S. Ct. 16, LRA 1918C 210. (373 U. S. at 293, 83 Sup. Ct. at 1246, 10 L. Ed. 2d at 356).

See also Watson v. Memphis, 373 U. S. 526, 83 Sup. Ct. 1314, 10 L. Ed. 2d 529 (1963).

In Cox v. Louisiana, 379 U. S. 536, 85 Sup. Ct. 453, 13 L. Ed. 2d 471 (1965), the United States Supreme Court again construed a disturbing the peace statute which is likewise similar to Mississippi Code Annotated section 2089.5 (Supp. 1964). The conduct and words of Cox and the fifteen hundred protesting students demonstrating with him present a considerably stronger case for a violation of Louisiana's breach of the peace statute than do the facts in the case at bar. Pointing out the similarity between the facts in the Cox case and the case of Edwards v. South Carolina, 372 U. S. 229, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963), the United States Supreme Court held that their independent examination of the record showed no conduct which the state had a right to prohibit as a breach of the peace, stating:

Appellant led a group of young college students who wished "to protest segregation" and discrimination against Negroes and the arrest of 23 fellow students. They assembled peaceably at the State Capitol building and marched to the courthouse where they sang, prayed and listened to a speech. A reading of the record reveals agreement on the part of the State's witnesses that Cox had the demonstration "very well controlled," and until the end of Cox's speech, the group was perfectly "orderly." Sheriff Clemens testified that the crowd's activities were not "objectionable" before that time. They became objectionable, according to the Sheriff himself, when Cox, concluding his speech, urged the students to go downtown and

sit in at lunch counters. The Sheriff testified that the sole aspect of the program to which he objected was "the inflammatory manner in which he (Cox) addressed the crowd and told them to go on uptown, go to four places on the protest list, sit down and if they don't feed you, sit there for one hour." Yet this part of Cox's speech obviously did not deprive the demonstration of its protected character under the Constitution as free speech and assembly. See Edwards v. South Carolina, supra; Cantwell v. Connecticut, 310 U. S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352; Thornhill v. Alabama, 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; Garner v. Louisiana, 368 U. S. 157, 185, 7 L. Ed. 2d 207, 226, 82 S. Ct. 248 (concurring opinion of Mr. Justice Harlan). (85 Sup. Ct. at 459-60, 13 L. Ed. 2d at 479).

The Court further pointed out as follows:

The State argues, however, that while the demonstrators started out to be orderly, the loud cheering and clapping by the students in response to the singing from the jail converted the peaceful assembly into a riotous one. The record, however, does not support this assertion. It is true that the students, in response to the singing of their fellows who were in custody, cheered and applauded. However, the meeting was an outdoor meeting and a key state witness testified that while the singing was loud, it was not disorderly. There is, moreover, no indication that the mood of the students was ever *hostile, aggressive, or unfriendly*. Our conclusion that the entire meeting from the beginning until its dispersal by tear gas was orderly and not riotous is confirmed by a film of the events taken by a television news photographer, which was offered in evidence as a state exhibit. (85 Sup. Ct. at 460, 13 L. Ed. 2d at 479-80). (Emphasis added.)

The United States Supreme Court pointed out that the Cox record does not show boisterous or violent con-

duct or indecent language on the part of the students, stating that the situation in the Cox case was a "far cry from the situation in Feiner v. New York, 340 U. S. 315 (95 L. Ed. 295, 71 S. Ct. 303)." (85 Sup. Ct. at 462, 13 L. Ed. 2d at 482).

It is obvious that the overt acts, the chanting, singing, the placards and statements involved in the demonstrations present in the Edwards and Cox cases are stronger potentials for causing a breach of the peace than are shown in the case at bar in which there is no parading, no placards, no speeches urging positive overt action on the part of appellant's companions.

The differences between the Cox and Thomas cases, *supra,* and the case at bar urged by appellee are that the case at bar does not involve a peaceful protest against segregation, and that there were only four or five unwarned and unprepared policemen present, as compared to the seventy-five or eighty policemen in the Cox and Thomas cases, wherein the law enforcement officers were forewarned and prepared; that in the case at bar there was threatened and impending violence, and the crowd could not have been controlled. These noted differences are insufficient to distinguish the cases.

Appellee urges that the case at bar should be sustained by giving to Mississippi Code Annotated section 2087.5 (Supp. 1964) a very narrow and specific construction. That is to say, this Court should hold that a statute must be limited to situations where, as applied to persons exercising a guaranteed constitutional right in a peaceful manner, they refuse to obey the police order to move on if, but only if, there is a clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace or order. This contention is precisely what was urged in the Thomas case, *supra,* and was completely ignored by the United States Supreme Court,

and rejected by that tribunal in the Thomas, Garner and Cox cases, *supra*.

The constitutional rights of this appellant, under the facts herein, cannot be denied because of hostility, for some unknown reason, on the part of a group of white citizens, to the exercise of these rights.

In conclusion, this Court does scrutinize carefully the decisions of the Supreme Court of the United States and expends a great deal of time and effort in this undertaking. Also, we are not unaware of the assistance and unlimited funds which appellant and defense counsel have at their command, but these factors have no bearing on the merits of this case.

We acknowledge that all courts are fallible and their decisions are subject to acrid criticism. Nevertheless, this Court is under authority of the United States Supreme Court. Our attitude toward a decision of that Court does not authorize or control its rejection or acceptance. We must follow the decision until it has been abrogated by constitutional and legal procedures. Irrespective of how erroneous it may appear, or how odious it is, a decision of the United States Supreme Court is still the ultimate in judicial determination and is binding on the tribunals and citizens of the respective states in comparable cases. As a self-governing agency it is imperative that this state operate under law, and law alone. The perversion of the law, regardless of the objective, can lead only to confusion, violence and anarchy. Just as water always seeks its own level, so absolute law will expose ultimately and punish its long submerged desecrations which have been committed in the name of justice.

For the foregoing reasons, the judgment of the circuit court is reversed and the appellant is discharged.

Reversed and appellant discharged.

*Lee, C. J., and Gillespie, Jones and Inzer, JJ.*, concur.