187 So.2d 854 (1966)
Charles McLAURIN
v.
CITY OF GREENVILLE.
No. 43429.
Supreme Court of Mississippi.
June 13, 1966.
*855 R. Jess Brown, Jackson, Jack Greenberg, Melvyn Zarr, New York City, for appellant.
Bogen, Wilkes & McGough, Robertshaw & Merideth, Greenville, for appellee.
INZER, Justice.
Appellant, Charles McLaurin, was convicted on a charge of disturbance of the public peace in violation of Mississippi Code Annotated section 2089.5 (Supp. 1964) in the Municipal Court of the City of Greenville. He appealed to the County Court of Washington County, where he was tried de novo before a jury. This trial resulted in a conviction, and he was sentenced to pay a fine of $100 and serve a term of ninety days in the city jail. From this conviction, he appealed to the circuit court, wherein the conviction was affirmed. The circuit judge allowed an appeal to this Court because of the constitutional question involved.
When this case reached this Court, it was consolidated with three other cases for the purposes of argument and submission to the Court. They are Cause No. 43,436, Cobb v. City of Greenville, Miss., 187 So.2d 861, which is a similar charge against Charles Cobb; Cause No. 43,497, Miss., 187 So.2d 861, which is a charge against this same appellant, Charles McLaurin, for resisting arrest; and Cause No. 43,498, Miss., 187 So.2d 860, which is a similar charge against Charles Cobb. The cases will be disposed of by separate orders. After the cases were submitted, it was discovered that the affidavits upon which these charges were based were not a part of the record, although they had been so designated by appellants in their notice of designation of record. The attention of counsel for the City and appellants was directed to this defect. The City suggested a diminution of the record, which suggestion was sustained. The affidavits are now a part of the records in all four cases.
The appellant's assignment of errors is as follows:
I. The court below erred in affirming a judgment of conviction which punishes conduct in the exercise of the right of free speech guaranteed by the Fourteenth Amendment to the Constitution of the United States.
II. The court below erred in approving the refusal of the trial court to give appellant's instruction that the jury could not find appellant guilty of breach of the peace if the police officers had made no reasonable effort to calm or disperse appellant's audience.
III. The court below erred in affirming a judgment of conviction based upon no evidence of guilt.
IV. The court below erred in affirming a judgment of conviction under a statute so vague and indefinite as to permit the punishment of the exercise of the right of free speech guaranteed by the Fourteenth Amendment to the Constitution of the United States.
V. The court below erred in approving the denial by the trial court of appellant's *856 motion to quash the jury panel on the ground of systematic exclusion of Negroes therefrom through prosecutorial abuse of peremptory challenges.
The proof on behalf of the City is sufficient to show that on July 1, 1963, a large crowd of people were present at the Municipal Court in the City of Greenville where two Negro girls were being tried on a charge of disorderly conduct. The courtroom which is in the municipal building seats about 300 people, and it was filled to capacity. About one-half of the people in the courtroom were Negroes, and one-half were white. There was also a large crowd, consisting of mostly Negroes, on the outside of the courtroom. Appellant was present at the trial, but was not in the courtroom. He had gone into the courtroom prior to the trial and was directed to a seat by Officer Willie Carson; however, he did not sit where Officer Carson directed him to sit, and when Carson spoke to him about it, McLaurin protested that the courtroom was segregated. He then went out of the courtroom and protested to the chief of police about the courtroom being segregated. When he returned to enter the courtroom, it was filled to capacity, and he was not allowed to enter again.
The trial resulted in the conviction of the two girls being tried, and most of the people then departed from the courtroom. Thereafter, although court was still in session, McLaurin went outside the building and after talking with some of the people who were present at the trial, he began to shout in a loud voice, attracting the attention of the people who were leaving, and many turned and came back. He backed up on the steps of the building, and in a loud voice began exhorting the crowd of about 200 people, mostly Negroes, which had gathered around him in front of the building. The crowd blocked the sidewalk all the way to the street and the entrances to the building. Officer Carson was on the outside of the building after the trial, and he testified that the crowd around McLaurin appeared to be upset over the outcome of the trial. Officer Carson is a Negro and had been employed on the police force in the City of Greenville for over thirteen years prior to the trial. He holds the rank of detective and has had experience as a military policeman in the armed forces. He said that McLaurin said in a loud voice, "What you people going to do about this; this is wrong, the White Caucasian, this law is wrong; you going to take it; you going to let them get away with it." The crowd began to mutter and say that it wasn't right. It appeared to Officer Carson that the situation was very tense and anything could happen. It was his opinion that McLaurin was exciting the crowd in order to get them to do something about the court's decision. Carson made his way through the crowd to where McLaurin was standing and told him he would have to stop, and that he could not block the sidewalk. McLaurin continued to talk, and once again Carson told him to stop. McLaurin refused, and Carson placed him under arrest. After he was arrested, McLaurin kept pulling back and talking over Carson's shoulder to the crowd, saying, "He's arresting me, what are you going to do about it." In order for Carson to get McLaurin into the building and out of the crowd, it was necessary for him to use all of his strength.
Captain Harvey Tackett, also a member of the City Police Force, was in front of the police station after the trial. He said that the first time he saw McLaurin, he was in the middle of the sidewalk in front of the station, and McLaurin started waving his arms and shouting in a loud voice to the people that were leaving. Most of the people immediately came back and gathered around McLaurin who then "jumped" upon the steps of the building and continued to shout and holler, asking the people what they were going to do about what had happened. The crowd started mumbling and saying something that he could not understand, but they appeared to be agreeing with McLaurin. It was his opinion that the *857 crowd was about to take the situation into their own hands, and he thought that a breach of peace was imminent. He had had long experience in police work, and it was his opinion that McLaurin would have to be removed or there would likely be a riot. He started over to where McLaurin was standing, but before he reached him, Officer Carson reached McLaurin and said something to him, which Captain Tackett could not hear. McLaurin kept shouting and hollering and waving his arms, and Carson said something else to him; however, McLaurin continued shouting. Then he saw Carson take McLaurin by the arm and forcibly carry him inside the building. During this time McLaurin was still shouting to the crowd.
Chief of Police W.C. Burnley was also present at the scene and saw and heard what transpired. He had been on the police force in Greenville for seventeen years and was a graduate of the FBI National Academy. He had received special training in methods relative to dealing with crowds. It was his opinion that the situation on the outside of the building was very tense. He saw McLaurin "jump" to the steps of the building and begin to shout and wave his arms in an emotional manner. He saw the people gather around him and many that were leaving turned and came back. He heard McLaurin shout, "Are you going to take this; what are you going to do about it," repeating these words over and over and other statements that he could not remember. It was his opinion that the speech of McLaurin was having an emotional effect upon the already tense crowd, and that any moment a riot or some other violence could take place.
Charles Cobb who was a Field Secretary employed by the Student Non-violent Co-ordinating Committee testified in behalf of appellant. It was his testimony that he saw McLaurin when he entered the courtroom and saw Officer Carson go up to him and say something. McLaurin then left, and Cobb went out to ascertain why McLaurin had left. He went with McLaurin to protest to Chief Burnley relative to segregation in the courtroom, and when they returned, they were not allowed to enter the courtroom. When the trial was over, he left McLaurin and went outside. When he next saw McLaurin he was standing on the sidewalk saying something to the people gathered there. He estimated that there were about 100 Negroes on the sidewalk in front of the municipal building. As McLaurin was talking he backed up the steps of the building, and although he was only twenty to thirty feet from McLaurin, he said he could not hear what McLaurin was saying. He saw one of two police officers say something to McLaurin, who continued talking. The officers then carried McLaurin into the municipal building. It was his opinion that the crowd did not appear to be so upset that they would do anything violent; he thought that they were mostly curious.
Appellant testified in his own behalf and said that he had been in Greenville off and on for about nine and one-half months. He was a Field Secretary for the Student Non-violent Co-ordinating Committee, and had been engaged in voter registration work during the time he had been in Greenville. He was also affiliated with other groups engaged in civil rights work, including a group of which the two Negro girls being tried were members. When he first went into the courtroom, he was directed to take a seat on the right side of the room, but he saw a vacant seat on the left side and sat there. He assumed that since he was directed to the right side where the Negroes were sitting that the left side was reserved for whites. After he sat down, Officer Carson told him he could not sit there. He asked Carson whether the courtroom was segregated, and Carson told him to come to the back of the room with him. He followed Carson out of the courtroom, but Carson didn't say anything else to him. He and Charles Cobb went to talk with Chief Burnley about the courtroom being segregated, and Burnley told them that they were in the room once, and turned *858 and walked away from them. He was not allowed to re-enter the courtroom, and stayed outside during the trial. After the trial, he then walked outside of the municipal building and began talking with some of the people who were present at the trial. He moved to the front of the building, and it appeared to him that the people coming out were shocked by the conviction of the girls. He said he started trying to get the attention of the crowd to tell them about registering and voting so that this kind of thing could not happen. Officer Carson then came up and told him that he could not make a speech without a permit, and when he continued to talk, Carson arrested him and carried him inside the building. He said, "I was saying different things like, this wouldn't have happened if Negroes were registered to vote, that in Washington County Negroes are in the majority of the population  50 per cent of the population is Negro and that they could have used the park or anyother (sic) thing had been registered voters." He was asked whether the crowd appeared angry and in a tense and angry mood, and he replied, "I feel that the crowd was sorta upset as to the out come (sic) of the trial, but certainly the words that I was using wouldn't have caused them to jump  to go in there and try to beat up the Judge. Negroes know they can't go beat up the Judge and be justified, and tear down the building and be justified, or jump on a policeman in the State of Mississippi and be justified." On cross-examination, he admitted that during the entire time he had been in Greenville he had not been interfered with in any way in his voter registration work. He said Negroes were allowed to register without interference, although some did not pass the test. Most of his work had been with groups under the voting age, and he had not been interfered with in any way in this work.
We will first address ourselves to the question of whether the circuit court was in error in affirming the action of the trial court, in overruling a motion of appellant to quash the jury panel on the ground of systematic exclusion of Negroes therefrom through prosecutorial abuse of peremptory challenges. Appellant contends that the trial court refused to allow him to show a pattern or practice of systematic exclusion by peremptory challenges by the City. This contention is not supported by the record in this case. The record reflects that the trial judge did at first deny appellant's motion to be allowed to show that the City had peremptorily challenged two Negroes, but immediately thereafter, she rescinded that ruling and granted appellant's motion. Appellant offered no further evidence in support of the motion to show that the City had followed the practice of systematically excluding Negroes by means of peremptory challenges. After the jury was selected, appellant made a motion to quash the panel because of systematic exclusion of Negroes therefrom because of race or color. He does not contend that the evidence in the record is sufficient to show a prosecutorial abuse of the peremptory challenges, but contends that this case should be remanded to give the appellant an opportunity to explore this matter further. There is no merit in this contention. In this connection, it is interesting to note that in Cause No. 43,498, which involves an appeal from McLaurin from a conviction on a charge of resisting arrest, wherein the City did not exercise its peremptory challenges to excuse Negroes from the jury panel, appellant made a motion to quash the panel because of systematic inclusion of Negroes. This position taken by appellant is without merit and deserves no further discussion. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).
The question of whether appellant's conduct in this case is protected by the First and Fourteenth Amendments to the Constitution of the United States presents the important question. It is appellant's contention that his speech was merely *859 a protest against segregated conditions in Greenville and the fact that it made the crowd restive and angry does not support a conviction for a breach of public peace. In support of this condition, he cites and relies upon the case of Terminiello v. Chicago, 307 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Terminiello was convicted of a violation of a city ordinance forbidding any breach of peace. The decision turned on the construction placed upon the ordinance by the trial court as reflected by the instructions to the jury. The court held that the construction was as binding upon it as though the precise words had been written into the ordinance. The conviction was reversed because the ordinance as construed by the Illinois court was at least partly unconstitutional. Appellant contends that he has been convicted of expressing unpopular views, and the construction of Mississippi Code Annotated section 2089.5 (Supp. 1964) by the trial court comes within the rule announced in Terminiello, supra. This directs our attention to the construction placed upon the statute by the trial court. This is reflected by the instructions to the jury as requested by the City and by the appellant. The court instructed the jury that if appellant was arrested for public protest against racial segregation, then they could not find the defendant guilty. The trial court recognized that section 2089.5 could not be applied to restrict appellant's constitutional right to protest against racial segregation, and that this statute could not be used to infringe upon the constitutional right of appellant or any other person to speak freely within the framework of the law. This Court is fully cognizant of our duty to construe our statutes in such a manner to be sure that they will not infringe upon the constitutional rights of any person. The statute as construed by the trial court is not unconstitutional.
Appellant also urges that section 2089.5 is so vague and indefinite as to permit the punishment of the exercise of the right of free speech guaranteed by the Fourteenth Amendment to the Constitution of the United States. His argument is based upon the contention that as applied here the term "breach of peace" reaches federally protected activities that create unrest in others. The statute as drawn is in broad terms, but it is not unconstitutional upon its face. It is true that it could be construed in such a manner that it would reach federally protected activities, but we are well aware of the fact that neither this statute nor any other statute may be construed so as to infringe upon the state or federally protected constitutional rights of appellant or any other person. This is evidenced by many decisions of this Court, including our decision in the case relative to the two girls whose conviction resulted in this action. Bolton v. City of Greenville, 253 Miss. 656, 178 So.2d 667 (1965); Bynum v. City of Greenville, 253 Miss. 667, 178 So.2d 672 (1965).
We find no merit in the assignment of error relative to the refusal of the trial court to grant appellant an instruction to the effect that the jury could not find appellant guilty of a breach of peace if the police officer made no reasonable effort to calm or disperse the crowd. We do not understand the law to be that when an officer is faced with a situation such as Officer Carson was confronted with in this case, where there was a clear and present danger of a riot or disturbance of court then in session, that such officer must, before arresting the person who is creating the danger, attempt to disperse the crowd. Such an attempt might well trigger the imminent danger, and in such cases, the officer must use his best judgment in determining the means or manner in which to prevent the threatened danger. The arrest of appellant and the subsequent arrest of Charles Cobb enabled the officers to control the situation that otherwise might have created a riot beyond control. The factual situation in this case is somewhat similar to the facts in the case of Feiner *860 v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), wherein the court quoted from Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), where it is said:
The language of Cantwell v. State of Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, is appropriate here. `The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.' 310 U.S. at page 308, 60 S.Ct. at page 905. (340 U.S. at 320, 71 S.Ct. at 306, 95 L.Ed. at 300.)
The factual situation involved in this case is entirely different from the situation involved in the cases of Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and Wright v. State of Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963), and these cases do not control.
Appellant's contention that there was no evidence of appellant's guilt of the charge is without merit. This contention is based solely upon the proposition that appellant's acts were constitutionally protected, and we hold that they were not for the reasons heretofore stated.
We have carefully considered all the questions raised by the appellant in this case, and we are of the opinion that there was ample evidence from which the jury could find that appellant was guilty of the offense charged. The constitutional rights of the appellant were fully protected, and this conviction must be affirmed.
Affirmed.
All Justices concur.