# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01201-COA

JASON D'WAYNE STEPHENSON                                    APPELLANT

v.

CHARLOTTE SCARBROUGH STEPHENSON                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/24/2020 |
| TRIAL JUDGE: | HON. KILEY CATLEDGE KIRK |
| COURT FROM WHICH APPEALED: | CHOCTAW COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | KEVIN RAY NULL |
| | MATTHEW DANIEL WILSON |
| ATTORNEY FOR APPELLEE: | NO APPEARANCE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/23/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     Jason and Charlotte Stephenson had been married for less than five months when they permanently separated. Jason's employer had transferred him to Choctaw County, a one-hour drive from the marital home in Neshoba County, and he wanted to move to Choctaw County to be closer to his work. But Charlotte did not want to move, so Jason moved without her. Four-and-a-half years later, Jason filed a complaint for divorce, alleging that Charlotte deserted him when she did not move with him. Jason further alleged that Charlotte could not be found, and he served process only by publication. Charlotte never entered an appearance or filed an answer. Following a trial, the chancellor ruled that Jason failed to prove desertion and denied his complaint for a divorce. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Jason and Charlotte Stephenson married in July 2015.  In November 2015, they separated.  In May 2020, Jason filed a complaint for divorce on the grounds of desertion, adultery, and habitual cruel and inhuman treatment.  He alleged that despite diligent search and inquiry, Charlotte's address was unknown to him.[1]  He served process by publication in *The Choctaw Plaindealer*.  Charlotte never appeared or filed an answer.

¶3.     At trial, Jason abandoned his allegations of adultery and habitual cruel and inhuman treatment and chose "to go forward on the desertion issue" only.  Jason testified that when he and Charlotte first married, he worked at the DeKalb Mine in Kemper County, and he and Charlotte lived in Neshoba County.  Soon after they married, Jason was transferred to the Red Hills Mine in Choctaw County, a one-hour drive from the marital home.  Because he was "working night shift and swing shift and stuff like that," he wanted to live closer to his job and decided to move to Choctaw County.  Charlotte "decided she didn't want to . . . move," so Jason moved without her.  Jason testified that if Charlotte had changed her mind and moved to Choctaw County within one year of their separation, he would have accepted her back and continued with the marriage.  But Charlotte never joined him in Choctaw

---

[1] In a sworn affidavit, Jason stated that he had been unable to determine Charlotte's address despite diligent search and inquiry.  However, when the chancellor asked him whether he had "attempted to look through social media to determine where [Charlotte] was located," Jason testified, "No.  I tried to cut all contact from her.  Whenever she said that she wasn't moving, I cut all contact."  Jason also testified that Charlotte's parents lived close to the former marital home in Neshoba County; however, Jason never contacted them to attempt to find Charlotte because he did not "have their phone numbers" and feared they would have him "locked up for trespassing" if he went on their property.  Finally, Jason testified that Charlotte called him around the time he filed the instant complaint for divorce; however, Jason "hung up on her" and "blocked the number that she called from."

County. Four-and-a-half years after he moved, Jason filed a complaint for divorce. Jason's daughter (Charlotte's stepdaughter) testified briefly and simply corroborated Jason's testimony that Charlotte did not move to Choctaw County. Jason then rested his case.

¶4. In support of his claim that Charlotte had deserted him, Jason relied on the Mississippi Supreme Court's statement that

> [t]he husband has the right to choose and establish the matrimonial domicile, and it is the duty of the wife to acquiesce in his selection and follow him to the domicile of his choice unless the choice has been unreasonably and arbitrarily exercised, or where the comfort, health, and general well being of the wife would not be jeopardized by such change of domicile.

*Ouzts v. Carroll*, 190 Miss. 217, 223, 199 So. 76, 78 (1940).

¶5. The chancellor denied Jason's request for a divorce. He concluded that *Ouzts* was no longer good law "within the framework of contemporary jurisprudence." The chancellor also found that even if *Ouzts* remained good law, Jason's unilateral decision to move and leave Charlotte behind "seem[ed] unreasonable of him, not her." Jason appealed.

## ANALYSIS

¶6. On appeal from the denial of a divorce, our standard of review is limited. *Stuckey v. Waid*, 195 So. 3d 872, 875 (¶13) (Miss. Ct. App. 2016). We will affirm the chancellor's ruling if it is "supported by substantial evidence" unless the chancellor abused his discretion, clearly erred, or applied the wrong legal standard. *Id.* "Even if we do not agree with the chancellor or might arrive at a different conclusion, if we cannot say with reasonable certainty that his findings were manifestly wrong and against the overwhelming weight of the evidence, we are still bound by his findings." *Torrence v. Moore*, 455 So. 2d 778, 780

3

(Miss. 1984). We review issues of law de novo. *Stuckey*, 195 So. 3d at 875 (¶13).[2]

¶7.     On appeal, Jason argues that *Ouzts* is still good law and that lower courts are bound by Mississippi Supreme Court precedent until it is overruled. Jason is, of course, correct that neither the chancellor nor this Court can overrule Mississippi Supreme Court precedent. But we agree with the chancellor that *Ouzts* is no longer good law.

¶8.     Although no case has specifically overruled *Ouzts*, we conclude that it has been overruled by decisions of the United States Supreme Court. *See Bolton v. City of Greenville*, 253 Miss. 656, 666, 178 So. 2d 667, 672 (1965) ("[A] decision of the United States Supreme Court is . . . the ultimate in judicial determination and is binding on the tribunals and citizens of the respective states in comparable cases."). The United States Supreme Court long ago held that under the Equal Protection Clause of the United States Constitution, "the old notion that generally it is the man's primary responsibility to provide a home and its essentials, can no longer justify a statute that discriminates on the basis of gender." *Orr v. Orr*, 440 U.S. 268, 279-80 (1979) (brackets and quotation marks omitted). That "old notion" is the only apparent basis for *Ouzts*'s holding that "[t]he husband has the right to choose and establish the matrimonial domicile," whereas the wife has only a "duty . . . to acquiesce . . . and follow." *Ouzts*, 190 Miss. at 223, 199 So. at 78. Therefore, *Ouzts* is no longer good law on

---

[2] Charlotte never appeared in the chancery court and did not file a brief on appeal. An appellee's failure to file a brief may be taken as a confession of error if, inter alia, the appellant's "brief makes out an apparent case of error"; however, we may affirm if "the record can be conveniently examined and such examination reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed." *Patrick v. Patrick*, 204 So. 3d 854, 857 (¶10) (Miss. Ct. App. 2016) (quoting *Jay Foster PLLC v. McNair*, 175 So. 3d 565, 571 (¶15) (Miss. Ct. App. 2015).

this point.

¶9.    As noted above, the chancellor also found that Jason failed to prove desertion because his unilateral decision to move and leave Charlotte behind was "unreasonable of him, not her." The dissent disagrees with the chancellor's finding and asserts that Jason moved "in good faith" and that Charlotte was duty-bound to follow him. *Post* at ¶16. The dissent's assertion ignores both our limited, deferential standard of review and the substantial evidence that supports the chancellor's finding.

¶10.    The dissent says that Jason "provided the sole financial support for the family." *Post* at ¶15. Although the dissent finds this to be of great importance, Jason never testified that he was the couple's sole financial support or offered any evidence about the couple's finances at trial. Indeed, he did not even mention Charlotte's employment status until the chancellor asked him about it:

| THE COURT: | Other than the fact that your wife didn't want to live in Choctaw County, was there any other reason as it regards this particular issue of desertion where you moved out of the house voluntarily that would cause the Court to believe that she deserted the marriage? |
| --- | --- |
| JASON: | Just that I had to work and that's the only place I was working. |
| THE COURT: | Was she working? |
| JASON: | No, sir. |

Jason did not offer any evidence as to why or for how long Charlotte had not been "working" at the moment he moved out of the marital home. Nor do we know whether Charlotte had any other source of income.

5

¶11.    Moreover, there was other evidence that Jason did not act "in good faith" when he moved out and left Charlotte behind. As noted above, Jason himself testified, "I tried to cut all contact from [Charlotte]. Whenever she said she wasn't moving, I cut all contact."

¶12.    In addition, the parties already owned a house in Neshoba County that was fully paid for. Although Jason wanted to shorten his one-hour commute, such commutes are not uncommon in this State. On the evidence presented, it was not unreasonable for Charlotte to think that the couple should remain in their fully-paid-for marital home rather than move a relatively short distance to Choctaw County. At the very least, we cannot say that the chancellor clearly erred or abused his discretion by reaching that conclusion. That is, the chancellor did not clearly err or abuse his discretion by finding that Jason's unilateral decision to move and leave Charlotte behind was "unreasonable" and that Charlotte did not "desert" Jason simply by continuing to live in the established marital home.

¶13.    In summary, Jason presented no evidence of desertion or any other grounds for divorce. Therefore, the chancellor properly ruled that Jason failed to prove desertion and properly denied Jason's request for a divorce.

¶14.    **AFFIRMED.**

    **BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY EMFINGER, J.**

    **CARLTON, P.J., DISSENTING:**

¶15.    Simply stated, "[t]he essence of desertion is one spouse's abandonment of the marriage without the other's consent." Deborah H. Bell, *Bell on Mississippi Family Law*

6

§ 4.02[5], at 64 (2005). In this case, I dissent because I find that Jason furnished sufficient evidence that Charlotte abandoned the marriage by refusing to change the marital domicile within one year from Jason's move from Neshoba County, Mississippi, to Choctaw County, Mississippi, because his job transferred him to the Red Hills Mine located in that county. My determination in this regard has nothing to do with Jason's gender. Instead, I find that the chancellor abused his discretion in finding that Jason acted unreasonably in moving to Choctaw County for his job—particularly in this case, where the only record evidence is that Jason provided the sole financial support for the family.

¶16. It is uncontroverted that Jason was the only one in the marital relationship with a job, and the record contains no evidence that Charlotte contributed in any way to the financial support for the family. The record reflects that Jason's change of the marital domicile was in good faith. Specifically, Jason and Charlotte were married in 2015 and were living in Neshoba County. Soon after they married, Jason was transferred to the Red Hills Mine in Choctaw County, which required a one-hour drive from the marital home. Because Jason worked the night shift or a swing shift, he wanted to live closer to his job. Charlotte refused to move, so he moved without her.

¶17. I recognize that after Charlotte refused to move, Jason did not reach out to her, which the majority points out. But there is no evidence in the record that he barred her from joining him at any time during the statutory one-year period required to establish desertion. *See* Miss. Code Ann. § 93-5-1 (Rev. 2013) (permitting a divorce for "[w]illful, continued and obstinate desertion for the space of one (1) year"). On the contrary, Jason testified that if

7

Charlotte had changed her mind and moved to Choctaw County within one year of their separation, he would have accepted her back and continued with the marriage.

¶18.    The majority also notes that Jason "hung up" on Charlotte when she contacted him around the time he filed the instant complaint for divorce in May 2020. *See ante* at n.1.  I do not find this relevant, as the statutory one-year period for desertion had expired about three years earlier in 2017.  And Jason testified that the reason Charlotte called was to "ask[] if we were divorced."  This scenario has no bearing on the desertion analysis under section 93-5-1.  In short, I find nothing in the record showing that the Jason's move for employment purposes was unreasonable.

¶19.    I recognize that Charlotte could have "defend[ed] against a claim of desertion by 'set[ting] up any misconduct of [Jason] . . . which justified the separation.'"  *Brown v. Brown*, 142 So. 3d 425, 428 (¶8) (Miss. Ct. App. 2013) (quoting *Ammons v. Ammons*, 144 Miss. 314, 318, 109 So. 795, 795 (1926)).  But in my review of the record, I find nothing evidencing any such "misconduct" on Jason's part.  Rather, I find that the chancellor abused his discretion in finding Jason's conduct was "unreasonable" in this case.  The record provides sufficient evidence that Charlotte abandoned the marital relationship by refusing to move with Jason under the circumstances, where his move was reasonable, and by failing to otherwise participate in the marital relationship for more than the requisite one-year period required to establish desertion.

¶20.    To be clear, I agree with the chancellor and the majority that Jason's gender does not give him priority to choose a domicile for his family.  Rather, regardless of gender, we must

look to determine whether the move was made in good faith; whether it was reasonable under the circumstances; and whether the spouse's refusal to move was reasonable under the circumstances. The analysis should clearly be gender neutral. For the reasons stated above, I respectfully dissent.

**EMFINGER, J., JOINS THIS OPINION.**