# FEINER *v.* NEW YORK.

No. 93.   Argued October 17, 1950.—Decided January 15, 1951.

*Sidney H. Greenberg* and *Emanuel Redfield* argued the cause for petitioner.  *Mr. Greenberg* filed a brief for petitioner.

*Dan J. Kelly* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Petitioner was convicted of the offense of disorderly conduct, a misdemeanor under the New York penal laws, in the Court of Special Sessions of the City of Syracuse and was sentenced to thirty days in the county penitentiary. The conviction was affirmed by the Onondaga County Court and the New York Court of Appeals, 300 N. Y. 391, 91 N. E. 2d 316 (1950). The case is here on certiorari, 339 U. S. 962 (1950), petitioner having claimed that the conviction is in violation of his right of free speech under the Fourteenth Amendment.

In the review of state decisions where First Amendment rights are drawn in question, we of course make an examination of the evidence to ascertain independently whether the right has been violated. Here, the trial judge, who heard the case without a jury, rendered an oral decision at the end of the trial, setting forth his determination of the facts upon which he found the petitioner guilty. His decision indicated generally that he believed the state's witnesses, and his summation of the testimony was used by the two New York courts on review in stating the facts. Our appraisal of the facts is, therefore, based upon the uncontroverted facts and, where controversy exists, upon that testimony which the trial judge did reasonably conclude to be true.

On the evening of March 8, 1949, petitioner Irving Feiner was addressing an open-air meeting at the corner of South McBride and Harrison Streets in the City of Syracuse. At approximately 6:30 p. m., the police received a telephone complaint concerning the meeting, and two officers were detailed to investigate. One of these officers went to the scene immediately, the other arriving some twelve minutes later. They found a crowd of about seventy-five or eighty people, both Negro and white, filling the sidewalk and spreading out into the street. Pe-

titioner, standing on a large wooden box on the sidewalk, was addressing the crowd through a loud-speaker system attached to an automobile. Although the purpose of his speech was to urge his listeners to attend a meeting to be held that night in the Syracuse Hotel, in its course he was making derogatory remarks concerning President Truman, the American Legion, the Mayor of Syracuse, and other local political officials.

The police officers made no effort to interfere with petitioner's speech, but were first concerned with the effect of the crowd on both pedestrian and vehicular traffic. They observed the situation from the opposite side of the street, noting that some pedestrians were forced to walk in the street to avoid the crowd. Since traffic was passing at the time, the officers attempted to get the people listening to petitioner back on the sidewalk. The crowd was restless and there was some pushing, shoving and milling around. One of the officers telephoned the police station from a nearby store, and then both policemen crossed the street and mingled with the crowd without any intention of arresting the speaker.

At this time, petitioner was speaking in a "loud, high-pitched voice." He gave the impression that he was endeavoring to arouse the Negro people against the whites, urging that they rise up in arms and fight for equal rights. The statements before such a mixed audience "stirred up a little excitement." Some of the onlookers made remarks to the police about their inability to handle the crowd and at least one threatened violence if the police did not act. There were others who appeared to be favoring petitioner's arguments. Because of the feeling that existed in the crowd both for and against the speaker, the officers finally "stepped in to prevent it from resulting in a fight." One of the officers approached the petitioner, not for the purpose of arresting him, but to get him to break up the crowd. He asked petitioner to get down

off the box, but the latter refused to accede to his request and continued talking. The officer waited for a minute and then demanded that he cease talking. Although the officer had thus twice requested petitioner to stop over the course of several minutes, petitioner not only ignored him but continued talking. During all this time, the crowd was pressing closer around petitioner and the officer. Finally, the officer told petitioner he was under arrest and ordered him to get down from the box, reaching up to grab him. Petitioner stepped down, announcing over the microphone that "the law has arrived, and I suppose they will take over now." In all, the officer had asked petitioner to get down off the box three times over a space of four or five minutes. Petitioner had been speaking for over a half hour.

On these facts, petitioner was specifically charged with violation of § 722 of the Penal Law of New York, the pertinent part of which is set out in the margin.[1] The bill of particulars, demanded by petitioner and furnished by the State, gave in detail the facts upon which the prosecution relied to support the charge of disorderly conduct. Paragraph C is particularly pertinent here: "By ignoring and refusing to heed and obey reasonable police orders issued at the time and place mentioned in the Information to regulate and control said crowd and to prevent a breach or breaches of the peace and to prevent injury to pedes-

---

[1] Section 722. "Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:

"1. Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior;

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;

"3. Congregates with others on a public street and refuses to move on when ordered by the police; . . . ."

trians attempting to use said walk, and being forced into the highway adjacent to the place in question, and prevent injury to the public generally."

We are not faced here with blind condonation by a state court of arbitrary police action. Petitioner was accorded a full, fair trial. The trial judge heard testimony supporting and contradicting the judgment of the police officers that a clear danger of disorder was threatened. After weighing this contradictory evidence, the trial judge reached the conclusion that the police officers were justified in taking action to prevent a breach of the peace. The exercise of the police officers' proper discretionary power to prevent a breach of the peace was thus approved by the trial court and later by two courts on review.[2] The courts below recognized petitioner's right to hold a street meeting at this locality, to make use of loud-speaking equipment in giving his speech, and to make derogatory remarks concerning public officials and the American Legion. They found that the officers in making the arrest were motivated solely by a proper concern for the preservation of order and protection of the general welfare, and that there was no evidence which could lend color to a claim that the acts of the police were a cover for suppression of petitioner's views and opinions. Petitioner was thus neither arrested nor convicted for the

---

[2] The New York Court of Appeals said: "An imminent danger of a breach of the peace, of a disturbance of public order, perhaps even of riot, was threatened. . . . the defendant, as indicated above, disrupted pedestrian and vehicular traffic on the sidewalk and street, and, with intent to provoke a breach of the peace and with knowledge of the consequences, so inflamed and agitated a mixed audience of sympathizers and opponents that, in the judgment of the police officers present, a clear danger of disorder and violence was threatened. Defendant then deliberately refused to accede to the reasonable request of the officer, made within the lawful scope of his authority, that the defendant desist in the interest of public welfare and safety." 300 N. Y. 391, 400, 402, 91 N. E. 2d 316, 319, 321.

making or the content of his speech. Rather, it was the reaction which it actually engendered.

The language of *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), is appropriate here. "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." 310 U. S. at 308. The findings of the New York courts as to the condition of the crowd and the refusal of petitioner to obey the police requests, supported as they are by the record of this case, are persuasive that the conviction of petitioner for violation of public peace, order and authority does not exceed the bounds of proper state police action. This Court respects, as it must, the interest of the community in maintaining peace and order on its streets. *Schneider* v. *State,* 308 U. S. 147, 160 (1939); *Kovacs* v. *Cooper,* 336 U. S. 77, 82 (1949). We cannot say that the preservation of that interest here encroaches on the constitutional rights of this petitioner.

We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker, and are also mindful of the possible danger of giving overzealous police officials complete discretion to break up otherwise lawful public meetings. "A State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions." *Cantwell* v. *Connecticut, supra,* at

308. But we are not faced here with such a situation. It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace. Nor in this case can we condemn the considered judgment of three New York courts approving the means which the police, faced with a crisis, used in the exercise of their power and duty to preserve peace and order. The findings of the state courts as to the existing situation and the imminence of greater disorder coupled with petitioner's deliberate defiance of the police officers convince us that we should not reverse this conviction in the name of free speech.

*Affirmed.*

[For opinion of MR. JUSTICE FRANKFURTER, concurring in the result, see *ante,* p. 273.]

MR. JUSTICE BLACK, dissenting.

The record before us convinces me that petitioner, a young college student, has been sentenced to the penitentiary for the unpopular views he expressed [1] on matters of public interest while lawfully making a street-corner

---

[1] The trial judge framed the question for decision as follows: "The question here, is what was said and what was done? And it doesn't make any difference whether whatever was said, was said with a loud speaker or not. There are acts and conduct an individual can engage in when you don't even have to have a crowd gathered around which would justify a charge of disorderly conduct. The question is, what did this defendant say and do at that particular time and the Court must determine whether those facts, concerning what the defendant did or said, are sufficient to support the charge." There is no suggestion in the record that petitioner "did" anything other than (1) speak and (2) continue for a short time to invite people to a public meeting after a policeman had requested him to stop speaking.

speech in Syracuse, New York.[2]   Today's decision, how-
ever, indicates that we must blind ourselves to this fact
because the trial judge fully accepted the testimony
of the prosecution witnesses on all important points.[3]
Many times in the past this Court has said that despite
findings below, we will examine the evidence for ourselves
to ascertain whether federally protected rights have been
denied; otherwise review here would fail of its purpose
in safeguarding constitutional guarantees.[4]   Even a par-

---

[2] There was no charge that any city or state law prohibited such
a meeting at the place or time it was held.   Evidence showed that
it was customary to hold public gatherings on that same corner
every Friday night, and the trial judge who convicted petitioner
admitted that he understood the meeting was a lawful one.   Nor
did the judge treat the lawful meeting as unlawful because a crowd
congregated on the sidewalk.   Consequently, any discussion of dis-
rupted pedestrian and vehicular traffic, while suggestive coloration, is
immaterial under the charge and conviction here.

It is implied in a concurring opinion that the use of sound
amplifiers in some way caused the meeting to become less lawful.
This fact, however, had nothing to do with the conviction of peti-
tioner.   In sentencing him the trial court said: "You had a perfect
right to appear there and to use that implement, the loud speaker.
You had a right to have it in the street."   See also note 1, *supra*.

[3] The trial court made no findings of fact as such.   A decision was
rendered from the bench in which, among other things, the trial
judge expressed some views on the evidence.   See note 11, *infra*.

[4] In *Norris* v. *Alabama*, 294 U. S. 587, the evidence as to whether
Negroes had been discriminated against in the selection of grand
juries was conflicting.   Chief Justice Hughes, writing for the Court,
said at pages 589–590: "The question is of the application of this
established principle [equal protection] to the facts disclosed by the
record.   That the question is one of fact does not relieve us of the
duty to determine whether in truth a federal right has been denied.
When a federal right has been specially set up and claimed in a state
court, it is our province to inquire not merely whether it was denied
in express terms but also whether it was denied in substance and
effect.   If this requires an examination of evidence, that examination
must be made.   Otherwise, review by this Court would fail of its
purpose in safeguarding constitutional rights.   Thus, whenever a con-

tial abandonment of this rule marks a dark day for civil liberties in our Nation.

But still more has been lost today. Even accepting every "finding of fact" below, I think this conviction makes a mockery of the free speech guarantees of the First and Fourteenth Amendments. The end result of the affirmance here is to approve a simple and readily available technique by which cities and states can with impunity subject all speeches, political or otherwise, on streets or elsewhere, to the supervision and censorship of the local police. I will have no part or parcel in this holding which I view as a long step toward totalitarian authority.

Considering only the evidence which the state courts appear to have accepted, the pertinent "facts" are: Syracuse city authorities granted a permit for O. John Rogge, a former Assistant Attorney General, to speak in a public school building on March 8, 1948 on the subject of racial discrimination and civil liberties. On March 8th, how-

---

clusion of law of a state court as to a federal right and findings of fact are so intermingled that the latter control the former, it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." This same rule has been announced in the following cases as well as in numerous others: *Truax* v. *Corrigan,* 257 U. S. 312, 324; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659; *Chambers* v. *Florida,* 309 U. S. 227, 228; *Pierre* v. *Louisiana,* 306 U. S. 354, 358; *Pennekamp* v. *Florida,* 328 U. S. 331, 335; *Patton* v. *Mississippi,* 332 U. S. 463, 466; *Craig* v. *Harney,* 331 U. S. 367, 373; *Oyama* v. *California,* 332 U. S. 633, 636; *Pollock* v. *Williams,* 322 U. S. 4, 13; *Fay* v. *New York,* 332 U. S. 261, 272; *Akins* v. *Texas,* 325 U. S. 398, 401; *Kansas City Southern R. Co.* v. *Albers Comm'n Co.,* 223 U. S. 573, 591; *First National Bank* v. *Hartford,* 273 U. S. 548, 552; *Fiske* v. *Kansas,* 274 U. S. 380, 385; *Great Northern R. Co.* v. *Washington,* 300 U. S. 154, 165–167. This Court has used varying phraseology in stating the circumstances under which it would review state court findings of fact, but it has not hesitated to make such review when necessary to protect a federal right. Compare *Great Northern R. Co.* v. *Washington, supra,* with *Taylor* v. *Mississippi,* 319 U. S. 583, 585–586.

ever, the authorities cancelled the permit. The Young Progressives under whose auspices the meeting was scheduled then arranged for Mr. Rogge to speak at the Hotel Syracuse. The gathering on the street where petitioner spoke was held to protest the cancellation and to publicize the meeting at the hotel. In this connection, petitioner used derogatory but not profane language with reference to the city authorities, President Truman and the American Legion. After hearing some of these remarks, a policeman, who had been sent to the meeting by his superiors, reported to Police Headquarters by telephone. To whom he reported or what was said does not appear in the record, but after returning from the call, he and another policeman started through the crowd toward petitioner. Both officers swore they did not intend to make an arrest when they started, and the trial court accepted their statements. They also said, and the court believed, that they heard and saw "angry mutterings," "pushing," "shoving and milling around" and "restlessness." Petitioner spoke in a "loud, high pitched voice." He said that colored people "don't have equal rights and they should rise up *in arms* and fight for them." [5] One man who heard this told the officers that if they did not take that "S . . . O . . . B . . ." off the box, he would. The officers then approached petitioner for the first time.

---

[5] I am accepting this although I believe the record demonstrates rather conclusively that petitioner did not use the phrase "in arms" in the manner testified to by the officers. Reliable witnesses swore that petitioner's statement was that his listeners "could rise up and fight for their rights by going arm in arm to the Hotel Syracuse, black and white alike, to hear John Rogge." The testimony of neither of the two officers contained the phrase "in arms" when they first testified on this subject; they added it only after counsel for the prosecution was permitted by the court, over petitioner's objection, to propound leading and suggestive questions. In any event, the statement ascribed to petitioner by the officers seems clearly rhetorical when read in context.

One of them first "asked" petitioner to get off the box, but petitioner continued urging his audience to attend Rogge's speech. The officer next "told" petitioner to get down, but he did not. The officer finally "demanded" that petitioner get down, telling him he was under arrest. Petitioner then told the crowd that "the law had arrived and would take over" and asked why he was arrested. The officer first replied that the charge was "unlawful assembly" but later changed the ground to "disorderly conduct." [6]

The Court's opinion apparently rests on this reasoning: The policeman, under the circumstances detailed, could reasonably conclude that serious fighting or even riot was imminent; therefore he could stop petitioner's speech to prevent a breach of peace; accordingly, it was "disorderly conduct" for petitioner to continue speaking in disobedience of the officer's request. As to the existence of a dangerous situation on the street corner, it seems far-fetched to suggest that the "facts" show any imminent threat of riot or uncontrollable disorder.[7] It

[6] "A charge of using language likely to cause a breach of the peace is a convenient catchall to hold unpopular soapbox orators." Chafee, Free Speech in the United States, 524. The related charge of conducting a "disorderly house" has also been used to suppress and punish minority views. For example, an English statute of 1799 classified as disorderly houses certain unlicensed places ("House, Room, Field, or other Place") in which "any Lecture or Discourse shall be publickly delivered, or any publick Debate shall be had on any Subject . . ." or which was used "for the Purpose of reading Books, Pamphlets, Newspapers, or other Publications . . . ." 39 Geo. III, c. 79, § 15.

[7] The belief of the New York Court of Appeals that the situation on the street corner was critical is not supported by the record and accordingly should not be given much weight here. Two illustrations will suffice: The Court of Appeals relied upon a specific statement of one policeman that he interfered with Feiner at a time when the crowd was "getting to the point where they would be unruly." But this testimony was so patently inadmissible that it was excluded by

is neither unusual nor unexpected that some people at public street meetings mutter, mill about, push, shove, or disagree, even violently, with the speaker. Indeed, it is rare where controversial topics are discussed that an outdoor crowd does not do some or all of these things. Nor does one isolated threat to assault the speaker forebode disorder. Especially should the danger be discounted where, as here, the person threatening was a man whose wife and two small children accompanied him and who, so far as the record shows, was never close enough to petitioner to carry out the threat.

Moreover, assuming that the "facts" did indicate a critical situation, I reject the implication of the Court's opinion that the police had no obligation to protect petitioner's constitutional right to talk. The police of course have power to prevent breaches of the peace. But if, in the name of preserving order, they ever can interfere with a lawful public speaker, they first must make all reasonable efforts to protect him.[8] Here the policemen did not even pretend to try to protect petitioner. According to the officers' testimony, the crowd was restless but there is

---

the trial judge in one of the rare instances where the defendant received a favorable ruling. Secondly, the Court of Appeals stated that after Feiner had been warned by the police, he continued to "blare out his provocative utterances over loud speakers to a milling, restless throng . . . ." I am unable to find anything in the record to support this statement unless the unsworn arguments of the assistant district attorney are accepted as evidence. The principal prosecution witness testified that after he asked Feiner to get down from the box, Feiner merely "kept telling [the audience] to go to the Syracuse Hotel and hear John Rogge." And this same witness even answered "No" to the highly suggestive question which immediately followed, "Did he say anything more about arming and fighting at that time?"

[8] Cf. *Hague* v. *C. I. O.*, 307 U. S. 496; *Terminiello* v. *Chicago*, 337 U. S. 1; *Sellers* v. *Johnson*, 163 F. 2d 877; see also, summary of Brief for Committee on the Bill of Rights of the American Bar Association as *amicus curiae*, *Hague* v. *C. I. O.*, *supra*, reprinted at 307 U. S. 678–682.

no showing of any attempt to quiet it; pedestrians were forced to walk into the street, but there was no effort to clear a path on the sidewalk; one person threatened to assault petitioner but the officers did nothing to discourage this when even a word might have sufficed. Their duty was to protect petitioner's right to talk, even to the extent of arresting the man who threatened to interfere.[9] Instead, they shirked that duty and acted only to suppress the right to speak.

Finally, I cannot agree with the Court's statement that petitioner's disregard of the policeman's unexplained request amounted to such "deliberate defiance" as would justify an arrest or conviction for disorderly conduct. On the contrary, I think that the policeman's action was a "deliberate defiance" of ordinary official duty as well as of the constitutional right of free speech. For at least where time allows, courtesy and explanation of commands are basic elements of good official conduct in a democratic society. Here petitioner was "asked" then "told" then "commanded" to stop speaking, but a man making a lawful address is certainly not required to be silent merely

---

[9] In *Schneider* v. *State,* 308 U. S. 147, we held that a purpose to prevent littering of the streets was insufficient to justify an ordinance which prohibited a person lawfully on the street from handing literature to one willing to receive it. We said at page 162, "There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." In the present case as well, the threat of one person to assault a speaker does not justify suppression of the speech. There are obvious available alternative methods of preserving public order. One of these is to arrest the person who threatens an assault. Cf. *Dean Milk Co.* v. *Madison,* 340 U. S. 349, decided today, in which the Court invalidates a municipal health ordinance under the Commerce Clause because of a belief that the city could have accomplished its purposes by reasonably adequate alternatives. The Court certainly should not be less alert to protect freedom of speech than it is to protect freedom of trade.

because an officer directs it. Petitioner was entitled to know why he should cease doing a lawful act. Not once was he told. I understand that people in authoritarian countries must obey arbitrary orders. I had hoped that there was no such duty in the United States.

In my judgment, today's holding means that as a practical matter, minority speakers can be silenced in any city. Hereafter, despite the First and Fourteenth Amendments, the policeman's club can take heavy toll of a current administration's public critics.[10] Criticism of public officials will be too dangerous for all but the most courageous.[11] This is true regardless of the fact that in

---

[10] Today the Court characterizes petitioner's speech as one designed to incite riot and approves suppression of his views. There is an alarming similarity between the power thus possessed by the Syracuse (or any other) police and that possessed by English officials under an act passed by Parliament in 1795. In that year Justices of the Peace were authorized to arrest persons who spoke in a manner which could be characterized as "inciting and stirring up the People to Hatred or Contempt . . ." of the King or the Government. 36 Geo. III, c. 8, §7. This statute "was manifestly intended to put an end for ever to all popular discussions either on political or religious matters." 1 Buckle, History of Civilization in England (2d London ed.) 350.

[11] That petitioner and the philosophy he espoused were objects of local antagonism appears clearly from the printed record in this case. Even the trial judge in his decision made no attempt to conceal his contempt for petitioner's views. He seemed outraged by petitioner's criticism of public officials and the American Legion. Moreover, the judge gratuitously expressed disapproval of O. John Rogge by quoting derogatory statements concerning Mr. Rogge which had appeared in the Syracuse press. The court approved the view that freedom of speech should be denied those who pit "class against class . . . and religion against religion." And after announcing its decision, the court persistently refused to grant bail pending sentence.

Although it is unnecessary for me to reach the question of whether the trial below met procedural due process standards, I cannot agree with the opinion of the Court that "Petitioner was accorded a full, fair trial."

two other cases decided this day, *Kunz* v. *New York,* 340 U. S. 290; *Niemotko* v. *Maryland,* 340 U. S. 268, a majority, in obedience to past decisions of this Court, provides a theoretical safeguard for freedom of speech. For whatever is thought to be guaranteed in *Kunz* and *Niemotko* is taken away by what is done here. The three cases read together mean that while previous restraints probably cannot be imposed on an unpopular speaker, the police have discretion to silence him as soon as the customary hostility to his views develops.

In this case I would reverse the conviction, thereby adhering to the great principles of the First and Fourteenth Amendments as announced for this Court in 1940 by Mr. Justice Roberts:

> "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell* v. *Connecticut,* 310 U. S. 296, 310.

I regret my inability to persuade the Court not to retreat from this principle.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MINTON concurs, dissenting.

Feiner, a university student, made a speech on a street corner in Syracuse, New York, on March 8, 1949. The purpose of the speech was to publicize a meeting of the

Young Progressives of America to be held that evening. A permit authorizing the meeting to be held in a public school auditorium had been revoked and the meeting shifted to a local hotel.

Feiner delivered his speech in a small shopping area in a predominantly colored residential section of Syracuse. He stood on a large box and spoke over loudspeakers mounted on a car. His audience was composed of about 75 people, colored and white. A few minutes after he started two police officers arrived.

The speech was mainly devoted to publicizing the evening's meeting and protesting the revocation of the permit. It also touched on various public issues. The following are the only excerpts revealed by the record:

"Mayor Costello (of Syracuse) is a champagne-sipping bum; he does not speak for the negro people."

"The 15th Ward is run by corrupt politicians, and there are horse rooms operating there."

"President Truman is a bum."

"Mayor O'Dwyer is a bum."

"The American Legion is a Nazi Gestapo."

"The negroes don't have equal rights; they should rise up in arms and fight for their rights."

There was some pushing and shoving in the crowd and some angry muttering. That is the testimony of the police. But there were no fights and no "disorder" even by the standards of the police. There was not even any heckling of the speaker.

But after Feiner had been speaking about 20 minutes a man said to the police officers, "If you don't get that son of a bitch off, I will go over and get him off there myself." It was then that the police ordered Feiner to stop speaking; when he refused, they arrested him.

Public assemblies and public speech occupy an important role in American life. One high function of

the police is to protect these lawful gatherings so that the speakers may exercise their constitutional rights. When unpopular causes are sponsored from the public platform, there will commonly be mutterings and unrest and heckling from the crowd. When a speaker mounts a platform it is not unusual to find him resorting to exaggeration, to vilification of ideas and men, to the making of false charges. But those extravagances, as we emphasized in *Cantwell* v. *Connecticut,* 310 U. S. 296, do not justify penalizing the speaker by depriving him of the platform or by punishing him for his conduct.

A speaker may not, of course, incite a riot any more than he may incite a breach of the peace by the use of "fighting words." See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. But this record shows no such extremes. It shows an unsympathetic audience and the threat of one man to haul the speaker from the stage. It is against that kind of threat that speakers need police protection. If they do not receive it and instead the police throw their weight on the side of those who would break up the meetings, the police become the new censors of speech. Police censorship has all the vices of the censorship from city halls which we have repeatedy struck down. See *Lovell* v. *City of Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Cantwell* v. *Connecticut, supra; Murdock* v. *Pennsylvania,* 319 U. S. 105; *Saia* v. *New York,* 334 U. S. 558.