Michael **BENSON** et al., Plaintiffs-Appellants,

v.

Joseph L. **RICH** et al., Defendants-Appellees.

Nos. 519-70, 520-70.

United States Court of Appeals, Tenth Circuit.

Oct. 18, 1971.

Donald Juneau, Window Rock, Ariz. (Willard F. Kitts, Albuquerque, N. M., with him on the brief), for appellants.

Kenneth Harrigan, Albuquerque, N. M., for appellee Rich.

Paul D. Gerber, Santa Fe, N. M. (Harl D. Byrd, Santa Fe, N. M., with him on the brief), for appellees Merry, DiGregorio, Kauzlaric and the Inter-Tribal Indian Ceremonial Association.

Robert G. McCorkle, Albuquerque, N. M., for appellee Johnson.

Before MURRAH, PICKETT and DOYLE, Circuit Judges.

PICKETT, Circuit Judge.

The appellants in this civil rights case are four young Navajo Indians who allege that their constitutional rights were infringed upon when officials of the Inter-Tribal Indian Ceremonial Association[1] prevented them from distributing printed leaflets during an Indian Ceremonial at Gallup, New Mexico during the month of August, 1969. In their complaint the appellants sought injunctive relief and damages. The action was dismissed as to two of the defendants in summary proceedings and after a trial on the merits the court held that the actions of the Association officials were not of such a nature as to deprive any of the appellants of constitutional rights and entered judgment for the appellees. We conclude that the record supports the court's findings. It is, therefore, only necessary to discuss herein the issue pertaining to the constitutional question.

The Ceremonial is recognized throughout the United States as an outstanding Indian function. It consists of four days of rodeos, arts and crafts exhibits, parades, Indian dances and other related performances and activities. The public is invited and is admitted to the grandstands on the Ceremonial Grounds upon payment of an admission charge. Attendance at each performance is about 8,000 persons, a substantial percentage of whom are of Indian descent.

Appellant Benson was critical of the manner in which the Ceremonials were conducted and decided to express his views to those in attendance through the distribution of a leaflet which he had prepared and had printed. In the distribution of these leaflets he enlisted the help of friends, including the other appellants.[2] The leaflet was entitled, "When Our Grandfathers Carried Guns". The first sentence read, "When our grandfathers carried guns, they were free and they were people." Another sentence read, "If we the Indians of today were like our grandfathers, we would not allow this Ceremonial to be held year after year in this manner and at this place." Many of the leaflet statements were emotional and highly critical of the Ceremonial and the general treatment of Indians by the people of Gallup. It concluded with the statement in reference to the Indians that "They were people * * * when their grandfathers had guns."

The Ceremonial officials had no advance information that the leaflets were to be distributed and it was called to their attention for the first time when Benson was observed in an area where large numbers of people were entering and leaving the grandstand. Witnesses described Benson's action as blocking the entrance and was referred to by one witness as a disturbance. There was testimony to the effect that the leaflets were being "stuffed" into the hands or arms of people.[3] Thereafter there was a conference between Benson and appellees DiGregorio, grandstand supervisor, Kauzlaric, Association president, and Johnson, a police officer. The discussion was friendly and Benson left after it

---

1. The Association is an official state agency created by N.M.S.A. § 73-31-1 (1953 Comp.). It is a nonprofit corporation created for the purpose of encouraging the preservation and development of Indian arts and crafts among the Indian tribes of the State of New Mexico. A further purpose is to encourage the preservation of traditional rites and ceremonials of Indian tribes and pueblos, and to afford an opportunity for the development of knowledge and appreciation of Indian arts, crafts, rites and ceremonials among

other people. The Ceremonial at Gallup has been an annual affair since 1922.

2. The evidence shows that all the discussions relating to the distribution of the leaflets were between Benson and some of the appellees, with no contact of any kind with other appellants.

3. The trial court found that when Benson was first observed handing out leaflets he was standing near the exit aisle of the main entrance to the grandstand during intermission and was "obstructing the orderly flow of the pedestrian traffic."

was agreed that the distribution of the leaflets on the Ceremonial Grounds would be discontinued. Immediately thereafter Benson joined a group of young Indians, all of whom engaged in a discussion concerning the leaflet. Benson told the group, "That cop took away my leaflets." A member of the group was heard to say that if Benson so desired, the group would tear apart or burn down the Ceremonial facilities. Shortly thereafter they all left the Ceremonial Grounds.

The following day Benson and others appeared at the Ceremonial Grounds and began handing out the leaflets. Kauzlaric then discussed the matter with an assistant state district attorney concerning the impact which the material in the leaflet might have upon people generally, and particularly those of Indian descent. This discussion included a recount of the remark about tearing apart or burning down the facilities which had been heard previously by Officer Johnson. The assistant district attorney concluded that the leaflet was a "call to arms" to the Indians and believed that it was necessary that the distribution be halted to prevent possible disorders or riots on the grounds.[4] It was agreed that if Benson and his followers, after a warning, continued in their activities, arrests should be made. This information was conveyed to Benson, whereupon he and others discontinued the distribution of the leaflets on the Ceremonial Grounds and left. No arrests were made. No attempts were made to prevent the circulation of the leaflets at any place except on the Ceremonial Grounds near the grandstands, and the evidence confirms that they were widely distributed throughout the City of Gallup, particularly along a street parade route.

The law is settled that the distribution of pamphlets and leaflets is a form of communication protected by the First Amendment and "so long as the means are peaceful, the communication need not meet standards of acceptability" to others. Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Neither does the desire to avoid the discomfort or unpleasantness which a communication may contain, if it does not interfere with the orderly function of a public activity, justify the prohibition of the particular expression of views or opinions. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is equally well settled that the state has the power to protect and preserve its property for the use to which it was dedicated, and there is no constitutional right to distribute pamphlets or leaflets whenever or wherever one pleases. Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The right of free speech does not mean that everyone with opinions or views may express them at any public place or at any time. "The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. * * * A restriction in that relation,

---

4. The trial court found:

"That the Assistant District Attorney interpreted the contents of the leaflet to amount to a call to arms and under the circumstances and the impact which the leaflet could have upon the thousands of people, including many of Indian descent, arriving for the afternoon performance on August 16, 1969, and the events of August 15, 1969, the Assistant District Attorney believed that a substantial disruptive material interference could develop and lead to a riot situation and upon being informed by the District Attorney that the Ceremonial grounds were private property advised Kauzlaric that he, as President of the Association, could withdraw Benson's permission to be on the Ceremonial grounds if he continued to pass out the leaflets and if Benson continued to do so then a criminal complaint could be made by the Association and Benson could be arrested for criminal trespass. Based upon this advice Kauzlaric informed Johnson that Kauzlaric, as President of the Association, was denying Benson's permission to be on the grounds if he continued to pass out the leaflets."

designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection." Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); American Communications Assn., C.I.O. v. Douds, 339 U.S. 382, 389, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

The officials in charge of the Gallup Ceremonials were familiar with the possibility of violent disorders which could erupt as a result of distribution of inflammatory statements during the ceremonies. They believed that the inflammatory statements directed against the officials and people of the City of Gallup could anger a large segment of individuals attending the ceremonies and create a riotous situation. They were aware of a statement made to Benson by one of a group of young Indians to the effect that upon a suggestion from Benson, the Ceremonial facility would be torn apart or burned. The officials were concerned because Benson, after agreeing not to distribute the leaflets on the Ceremonial Grounds, had renewed his activities without further consultation with the officials. Under these circumstances, those in charge could take reasonable and good faith action to prevent a disastrous situation which they had reason to believe could occur. The trial court found that these conditions existed and the sufficiency of the evidence to sustain the findings is not questioned.

There was a clear and present danger of violence and disorder and the officials were not required to wait until the feared conditions actually happened to take preventive action. In a somewhat similar situation, the court said, in Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195, 199 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970): "It is not required that the college authorities delay action against the inciters until after the riot has started and buildings have been taken over and damaged. The college authorities had the right to nip such action in the bud and prevent it in its inception. * * *" In Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), the Court, quoting from Cantwell v. Connecticut, 310 U.S. 296, 60 S. Ct. 900, 84 L.Ed. 1213 (1940), used this language: "No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious."

■■ Communities have an interest in maintaining peace and order in their areas, particularly on public property. Indeed, they have that duty, but the free discussion and dissemination of ideas and opinions cannot be suppressed under the guise of conserving the peace. The principle involved in Feiner v. New York, *supra*, is similar to the one presented here, and the following statement of the Court is appropriate: "It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace. * * *" Feiner v. New York, 340 U.S. 315, 321, 71 S.Ct. 303 (1951). The action of the public officials was not directed toward the dissemination of ideas or opinions, but solely to maintain peace and order on the Ceremonial Grounds and the prevention of violence and a riotous situation. No attempt was made to prevent the circulation of the leaflets elsewhere.

Affirmed.