261 So.2d 151 (1972)
CITY OF ST. PETERSBURG, a Municipal Corporation, Petitioner,
v.
Joseph WALLER, Jr., Respondent.
No. 41080.
Supreme Court of Florida.
April 12, 1972.
Rehearing Denied May 12, 1972.
*152 Carl R. Linn, Asst. City Atty., for petitioner.
Gardner W. Beckett, Jr., of Nelson, Beckett, Nelson & Thomas, St. Petersburg, for respondent.
BOYD, Judge.
This cause is before us on petition for writ of certiorari to review the decision of the District Court of Appeal, Second District, reported at 245 So.2d 685. Jurisdiction is based on conflict between the decision sought to be reviewed and Nixon v. State.[1]
Respondent, defendant below, is the leader of a militant organization called JOMO, for Junta of Military Organization. On the night of August 14, 1968, defendant and a group of JOMO members left their headquarters on Harrington Avenue South in the City of St. Petersburg and went looking for the police following a report that a person named Loretta Munderlyn had been arrested on 22nd Street and 7th Avenue. Defendant had with him an amplified megaphone and his followers wore the distinctive dress or uniform of their organization. A police cruiser on routine patrol first spotted the group gathered at the corner of 22nd Street and 9th Avenue. As the police car approached, people in the group yelled, "Here come the pigs. Here they come. Look at the pigs." As the car came closer the crowd began to chant, "Pig, pig." On reaching the corner of 22nd Street and 9th Avenue, abreast of the group, the cruiser slowed to a stop for a red light. At this point, defendant Waller stepped into the street, thrust his megaphone close to the front right-hand window of the police car and yelled, "Pig. White pig. Sooey, sooey." The megaphone was described as "very loud" and sufficient to be heard for blocks away. Other members of the group behind the defendant yelled, "Pig" and various obscenities at the officers in the car.
The officers radioed for a conference with the shift Lieutenant, Lieutenant Colman, who met them at a corner six blocks away. Lieutenant Colman in a patrol car with one other officer then proceeded to the scene followed by the car that had first encountered *153 the group. A third police car subsequently arrived so that there were a total of nine officers at the scene.
As Lieutenant Colman's car approached the group on the corner of 22nd Street, they could hear from half a block away the words, "Pig, white pig, hey, there's the pigs," shouted in their direction through a sound-powered megaphone. Defendant was using the megaphone and was the most vocal and noticeable member of the group. As the Colman car approached, the group moved down from the curb and into the street. Defendant again directed the megaphone very close to the cruiser and yelled through it at the officers inside. Some of the individuals in the group started around to the front of the car and others, including the defendant, went to the rear of the car. Lieutenant Colman met the defendant at the rear of the car and arrested him, holding him with a nightstick placed across his body and grasped at either end. Thus restrained, the defendant offered no immediate resistance. By this time the second carload of officers had arrived at the scene. Lieutenant Colman started walking Waller back to the car and sought to turn him over to Sergeant Mein so that he, Colman, could turn his attention to other individuals of the group. As soon as Lieutenant Colman released defendant, a scuffle broke out and the defendant became very vocal again, shouting obscenities in a loud voice and attracting other onlookers to the area. Officer Hanson assisted Sergeant Mein who was struggling with the defendant. The defendant continued cursing, yelling, spitting on the officers and yelling "White M____-F____" and similar obscenities. At this point, the defendant's sister broke from the crowd and grabbed one of the officers from behind. She was yelling various obscenities at the officers and was subsequently arrested. While she was struggling with the officers who were arresting the defendant, another member of defendant's group, one Fred Hamilton, broke from the crowd and grabbed Officer Hanson. During the struggle Officer Hanson's gun was unstrapped and pulled half-way from the holster before Officer Trappman came to his assistance and arrested Hamilton.
By this time quite a crowd had collected and, as the officers left the scene with their prisoners, rocks and bottles were thrown by the crowd that had gathered. During the ride back to the police station, defendant became violent and kicked Officer Murphy, spit in his face and cursed him with various obscenities.
Defendant was charged with (1) simple assault in violation of City Ordinance 25.4; (2) obscene language in violation of City Ordinance 25.42; and (3) verbal abuse of a police officer in violation of City Ordinance 25.43.1. At the trial, defendant admitted yelling "Pig" at the police officers through the megaphone, but only after he was arrested. He denied resisting arrest, claimed he was subjected to police brutality and contended that the arrest was illegal because at the time of the arrest he was not informed of the offense against him. His counsel contended at the trial that because of defendant's reputation as a known trouble-maker, the police were out to get him and that the increased police activity in the area, including surveillance of the JOMO headquarters constituted "provocation" for the incident. It was argued that the return of the police officers to the scene where the group was yelling "Pig" constituted entrapment, since the police thereby brought themselves "into the ambit of those words." Defendant also contended that the Ordinance proscribing verbal abuse of a police officer was unconstitutionally vague.
Defendant was tried in the Municipal Court before the Honorable Henry Esteva and found guilty on all three charges. He was sentenced to ninety (90) days' imprisonment on each of the three charges. On appeal, the Circuit Court affirmed the conviction.
Defendant sought certiorari in the District Court and was successful in having *154 Ordinance Section 25.43.1 declared unconstitutionally overbroad and specifically the language "verbal abuse" void. The District Court directed discharge of the defendant on the charge of verbal abuse and ordered a new trial on the other two convictions. The United States Supreme Court decision in Chaplinsky v. New Hampshire[2] was distinguished and the District Court found that other decisions of the United States Supreme Court commanded a declaration of the Ordinance's invalidity.[3]
The Ordinance in question in the instant case is Ordinance 25.43.1 of the City of St. Petersburg, which provides as follows:
"It shall be unlawful for any person to challenge to fight, assault, strike, verbally abuse or make derogatory remarks to a police officer in the performance of his duties."
A similar ordinance was held valid in Nixon v. State,[4] thereby creating jurisdictional conflict.
The District Court in the instant case correctly stated the test for constitutionality of a statute or ordinance of the type here involved as whether the language "is sufficiently precise to describe an offense so as to give fair warning to the citizen that certain speech is prohibited."[5]
The rule is stated by the United States Supreme Court in U.S. v. National Dairy Products, as follows:[6]
"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."
In a leading case, Chaplinsky v. New Hampshire,[7] the United States Supreme Court upheld the following ordinance against the charge of vagueness:
"No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation."
Chaplinsky, a member of a sect known as Jehovah's Witnesses, was distributing the literature of his sect on a busy street in the City of Rochester and denouncing all religion as a "racket." The crowd was getting restless. A traffic officer on duty at the intersection started with Chaplinsky for the police station. On the way they met a Marshal who had been advised that a riot was imminent and was hurrying to the scene. On meeting the Marshal, Chaplinsky *155 addressed the following words to him:
"`You are a God damned racketeer' and `a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists'... ."
Chaplinksy was tried and convicted of violation of the Ordinance. His conviction was affirmed by the state courts and by the United States Supreme Court, stating:[8]
"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' words  those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. `Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' Cantwell v. Connecticut, 310 U.S. 296, 309, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213."
Of importance to the decision upholding the Ordinance in Chaplinsky was the restrictive construction placed on that Ordinance by decisions of the New Hampshire Court.[9] The Supreme Court concluded that the Ordinance, as construed by the State Court, was limited to verbal acts uttered under such circumstances as were likely to cause a breach of the peace. The Court held that the words used by Chaplinsky "are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace."[10]
We note that the Ordinance of the City of St. Petersburg, on its face, is more restrictive than the Ordinance of the City of Rochester upheld in the Chaplinsky case, supra, in that the St. Petersburg Ordinance prohibits certain conduct and verbal acts directed to a police officer in the performance of his duty. Implicit in this Ordinance is the requirement that the acts prohibited interfere with the officer in the performance of his duties, primarily through incitement to breach of the peace.
The facts before us present a classic case of the type of verbal act the Ordinance was designed to prohibit. Defendant might as well have yelled "Fire" in a crowded theater as yell "Pig" under the facts of this case. His words were calculated to, and in this case, did, in fact, interfere with the officers in the performance of their duty. A crowd was attracted to the scene and incited to violence against the officers.
The Ordinance before us seeks to prevent breach of the peace likely to result *156 from ridicule and abuse of an officer, a symbol of the law enforcement authority of government, while he is in the performance of his duty. The Ordinance is not primarily concerned with offense to the sensibility of individual police officers, but rather with the reaction of bystanders, friends, family and members of the public who might be incited to action, either against the officer or against the person speaking the words. Again, the instant case is clearly illustrative of the type of situation covered by the Ordinance.
The District Court found the words "verbal abuse" vague and overbroad. We disagree. The average man of normal intelligence would understand the meaning of the words. Listing of specific words constituting verbal abuse is not required for obvious reasons.[11] This Court can take judicial notice of what is common knowledge that the word "pig" has, in recent times, come to be used as a derisive name for the police. The same word when applied to a domesticated farm animal or, in jest, to a person who overeats, is not a "fighting word." It is the context within which the word is used which determines its import. "For everything there is a season and a time for every matter under heaven."[12]
In Youngdahl v. Rainfair, Inc.,[13] the United States Supreme Court was concerned with whether the use of the word "scab" by strikers was protected speech under the First Amendment of the Constitution, and held it was not, stating:[14]
"The issue here is whether or not the conduct and language of the strikers were likely to cause physical violence. Petitioners urge that all of this abusive language was protected and that they could not, therefore, be enjoined from using it. We cannot agree. Words can readily be so coupled with conduct as to provoke violence. * * * Petitioners contend that the words used, principally `scab' and variations thereon, are within a protected terminology. But if a sufficient number yell any word sufficiently loudly showing an intent to ridicule, insult or annoy, no matter how innocuous the dictionary definition of that word, the effect may cease to be persuasion and become intimidation and incitement to violence." (Emphasis supplied.)
In another decision, Feiner v. New York,[15] the United States Supreme Court upheld the disorderly conduct conviction of a student who addressed a crowd in the City of Syracuse, New York, through a loudspeaker making "derogatory remarks" concerning political officials and giving "the impression that he was endeavoring to arouse the Negro people against the whites."[16] In upholding Feiner's conviction under § 722 of the Penal Law of New York, McKinney's Consol.Laws, c. 40[17], the United States Supreme Court stated:[18]

*157 "It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace. Nor in this case can we condemn the considered judgment of three New York courts approving the means which the police, faced with a crisis, used in the exercise of their power and duty to preserve peace and order. * * *"
The Feiner decision was recently relied on by the United States Circuit Court of Appeals, Tenth Circuit, in Benson v. Rich,[19] to affirm the action of local officials in preventing circulation of a leaflet during an Indian ceremonial at Gallup, New Mexico. The leaflet was printed by four Navajo Indians and stated, inter alia, "When our grandfathers carried guns, they were free and they were people." The leaflet was viewed by local officials as a "call to arms" and its distribution was halted to prevent possible disorders. The Circuit Court of Appeals affirmed the action of the officials in preventing the distribution of the leaflet, holding:[20]
"The right of free speech does not mean that everyone with opinions or views may express them at any public place or at any time. `The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. * * *'"
The United States District Court in Turner v. LaBelle,[21] upheld Connecticut Statute Section 53-44, which subjects to criminal penalties anyone who "advocates, encourages, justifies, praises, incites, or solicits any assault upon * * * the police force of this or any other state * * * or the killing or injuring of any class or body of persons, or of any individual * * *." Turner and three others were charged with violating the foregoing Statute as the result of speeches made at a public meeting in Hartford, Connecticut. The language held to violate the Statute included the following:[22]
"`Now I tell you, you treat every cop as your enemy, whether he's white or black until things in America wakes up, until America wakes up.' Williams said, `If I can't be imported back, then kill me, kill me, or I'll kill you,' and `anyone that's black is so very angry * * * that he wants to fight, that he wants to shoot, well then, only turn your eyes to the left, to the blue shirts.'"
The United States District Court read the words of the Statute "justifies" and "praises" in the sense of "encourages," "advocates," and "incites" and held:[23]
"Thus read, the statute is neither overbroad nor vague, nor does it, though precise, penalize constitutionally protected conduct. To encourage an assault on a policeman or individual is `likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest * * *.'" (Emphasis supplied.)
The fact that "marginal" factual situations may arise under a statute or ordinance does not, in itself, render the enactment vague.[24] In Williams v. U.S.[25] the *158 United States Supreme Court upheld § 20 of the United States Criminal Code[26] which provides:
"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, ..., shall be fined not more than $1,000, or imprisoned not more than one year, or both."
In affirming a conviction under the foregoing act, the United States Supreme Court held:[27]
"Many criminal statutes might be extended to circumstances so extreme as to make their application unconstitutional. Conversely, ..., a close construction will often save an act from vagueness that is fatal. The present case is as good an illustration as any. * * * This is the classic use of force to make a man testify against himself. * * * Some day the application of § 20 to less obvious methods of coercion may be presented and doubts as to the adequacy of the standard of guilt may be presented."
A few days ago, on March 23, 1972, the United States Supreme Court released its decision in Gooding v. Wilson[28] reaffirming its adherence to the doctrine of Chaplinsky v. New Hampshire, supra. A Georgia Statute[29] was stricken because the appellate courts of Georgia failed to limit the language of the Statute to "fighting words" as required by the Chaplinsky case. The United States Supreme Court found that the Georgia Court had construed the Statute in such a way as to cover "words offensive to some who hear them."[30] The United States Supreme Court stated:[31]
"We conclude that `[t]he separation of legitimate from illegitimate speech calls for more sensitive tools than [Georgia] has supplied.' Speiser v. Randall, supra, at 525. The most recent decision of the Georgia Supreme Court, Wilson v. State, supra, in rejecting appellee's attack on the constitutionality of § 26-6303, stated that the statute `conveys a definite meaning as to the conduct forbidden, measured by common understanding and practice.' * * * Because earlier appellate decisions applied § 26-6303 to utterances where there was no likelihood that the person addressed would make an immediate violent response, it is clear that the standard allowing juries to determine guilt `measured by common understanding and practice' does not limit the application of § 26-6303 to `fighting' words as defined by Chaplinsky." (Emphasis supplied.)
The Ordinance of the City of St. Petersburg, presently under consideration, is more limited and restrictive in scope than any of the ordinances or statutes in the authorities cited. It prohibits verbal assault, as well as physical or bodily assault, on a police officer in the performance of his duties. We construe the verbal acts prohibited as strictly limited to words having a direct tendency to cause acts of violence, the "fighting words" recognized by Chaplinsky as one step away from violence. Mere displeasure, annoyance or resentment is not sufficient. As we have indicated, *159 the words, taken under the circumstances spoken, must interfere with the officer in the performance of his duty, primarily through incitement to violence and breach of the peace.
In the instant case, the word "Pig", at the time it was spoken, was a call to violence against the police officers. That word was hurled by defendant through his megaphone  a verbal brickbat. The language here in question had no other significance other than to arouse the crowd to action against the officers.
We have also considered defendant's other contentions and find them to be without merit. Since § 25.43.1 of the City Code is valid, defendant's arrest thereunder was valid. The Circuit Court correctly found in its order on appeal that it was not necessary for the officer to inform the defendant of the charge against him at the time he was arrested, since defendant was then in the process of committing the offense. Florida Statutes § 901.17, F.S.A. provides that a person arrested be informed of the cause of his arrest "unless the person to be arrested is then engaged in the commission of an offense... ."
Defendant does not question the validity of the other ordinances under which he was convicted. He does suggest, however, that his actions should constitute only one offense, rather than three. We find no basis for this argument. It is clear that a series of incidents, such as those involved in the instant case, may give rise to more than one violation of the law. We note that in the recent United States Supreme Court decision of Gooding v. Wilson, supra, the defendant, as a result of his activities during a "demonstration" was charged with two counts of assault and battery, two counts of using abusive language under State law and two charges of violation of Federal law.[32]
Accordingly, petition for writ of certiorari is granted, the decision of the District Court of Appeal is quashed and the cause remanded with directions to remand for reinstatement of the trial court's judgment.
It is so ordered.
ROBERTS, C.J., and ERVIN, CARLTON and DEKLE, JJ., concur.
NOTES
[1] 178 So.2d 620 (Fla.App.3rd) 1963; cert. denied 385 U.S. 853, 87 S.Ct. 97, 17 L.Ed.2d 81 (1966).
[2] 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
[3] Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1938); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Winters v. N.Y., 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).
[4] 178 So.2d 620, 621 (Fla.App.3rd 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 97, 17 L.Ed.2d 81 (1966): "Any person in the city shall be deemed guilty of disorderly conduct who: * * * 7. Uses obscene or profane language in the presence of anyone else, or any indecent, insulting or abusive language to another, or makes any threats of violence against another person." (Emphasis supplied.)
[5] Waller v. City of St. Petersburg, 245 So.2d 685, 687 (Fla.App.2d 1971).
[6] 372 U.S. 29, 32, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963).
[7] 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
[8] Id. at 571, 62 S.Ct. at 769.
[9] Id. at 573, 62 S.Ct. at 770: "On the authority of its earlier decisions, the state court declared that the statute's purpose was to preserve the public peace, no words being `forbidden except such as have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed'. It was further said: `The word "offensive" is not to be defined in terms of what a particular addressee thinks ... The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight.... The English language has a number of words and expressions which by general consent are "fighting words" when said without a disarming smile.' ..."
[10] Id. at 574, 62 S.Ct. at 770.
[11] Campbell v. State, 240 So.2d 298, 299 (Fla. 1970): "The particular words complained of, `unnecessarily or excessively' are not vague when considered in the context of the entire Statute and with a view to effectuating the purpose of the act. The fact that specific acts of chastisement are not enumerated, an impossible task at best, does not render the statutory standard void for vagueness. Criminal laws are not `vague' simply because the conduct prohibited is described in general language."
[12] Ecclesiastes 3:1.
[13] 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957).
[14] Id. at 138, 78 S.Ct. at 211.
[15] 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1950).
[16] Id. at 317, 71 S.Ct. at 305.
[17] "Section 722. Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct: (1) Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior; * * *." (Emphasis supplied.)
[18] 340 U.S. 315, 321, 71 S.Ct. 303, 306, 307 (1950).
[19] 448 F.2d 1371 (CCA 10th 1971).
[20] Id. at 1373.
[21] 251 F. Supp. 443 (D.C.D.Conn. 1966).
[22] Id. at 445.
[23] Id. at 446.
[24] Roth v. U.S., 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, reh. den. 355 U.S. 852, 78 S.Ct. 8, 2 L.Ed.2d 60 (1957); U.S. v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561, reh. den. 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13 (1963).
[25] 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).
[26] 18 U.S.C. § 242.
[27] 341 U.S. 97, 101, 71 S.Ct. 576, 579 (1951).
[28] 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).
[29] Ga. Code § 26-6303: "Any person who shall, without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace ... shall be guilty of a misdemeanor."
[30] 405 U.S. 527, 92 S.Ct. 1108, 31 L.Ed.2d 408 (1972).
[31] Ibid.
[32] Wilson's convictions for (1) attempting to interfere with the administration of the Universal Military and Training Service Act in violation of 50 U.S.C.App. § 462 (a) and for (2) willfully injuring property of the United States, in violation of 18 U.S.C. § 1361, were affirmed in Tillman v. U.S., 406 F.2d 930 (CCA 5th 1969).